**PRECEDENTIAL**

UNITED STATES COURT OF APPEALS
FOR THE THIRD CIRCUIT

_____

No. 22-1560

_____

UNITED STATES OF AMERICA

v.

MOSHE PORAT,
Appellant

_____

Appeal from the United States District Court
for the Eastern District of Pennsylvania
(D.C. No. 2-21-cr-00170-001)
District Judge: Honorable Gerald J. Pappert

_____

Argued May 18, 2023

_____

Before: KRAUSE, PHIPPS, and CHUNG, *Circuit Judges.*

(Filed: August 7, 2023)

Mark B. Dubnoff **[ARGUED]**
Nancy E. Potts
Mary Teresa Soltis

Office of the United States Attorney
615 Chestnut Street
Suite 1250
Philadelphia, PA 19106

*Counsel for Appellee*

Avery D. Medjuck
Theodore D. Sampsell-Jones
Alexandra A.E. Shapiro **[ARGUED]**
Shapiro Arato Bach
1140 Avenue of the Americas
17th Floor
New York, NY 10036

*Counsel for Appellant*

Tai H. Park
1140 Avenue of the Americas
17th Floor
New York, NY 10036

*Counsel for Amicus Appellants Professor Stephen F.
Smith and Notre Dame Law School*

Michael D. Pepson
Americans for Prosperity Foundation
1310 N Courthouse Road
Suite 700
Arlington, VA 22201

*Counsel for Amicus Appellant Americans for
Prosperity Foundation*

---

OPINION OF THE COURT

---

CHUNG, *Circuit Judge.*

Moshe Porat, the former Dean of the Fox School of Business at Temple University ("Fox"), appeals his convictions for conspiracy to commit wire fraud, in violation of 18 U.S.C. § 371, and wire fraud, in violation of 18 U.S.C. § 1343.

On appeal, Porat argues that the government did not plead or prove by sufficient evidence (1) that he sought to deprive his victims of money, (2) that he sought to personally obtain money, or (3) that the party he deceived was the same party he defrauded of money (*i.e.*, "convergence"). With regard to the second issue, Porat also argues that the District Court erred in refusing to provide the jury with the instructions he sought. Because the evidence was sufficient for a rational jury to convict him, and because the government need not prove either that the scheme was intended to personally benefit Porat or "convergence," we will affirm.

## I.    BACKGROUND

### A.    Factual Background

Porat was convicted for his scheme to raise Fox's "rankings" in U.S. News and World Report ("U.S. News"), a publication that rates colleges and graduate schools, including

business schools.[1]   The government offered evidence that, while some have criticized these rankings as poor measures of a school's quality, many people rely on them to compare business schools.  These include applicants, students, alumni, donors, employers, faculty, and the schools themselves.

Porat was Fox's Dean from 1996 to 2018.  During his time at Fox, he was "almost obsessed with rankings."  Suppl. App. ("SA") 399.  Sometime in the early 2000s, Porat created a committee that met regularly to consider the data that Fox would provide for use by U.S. News in formulating rankings. It also studied the rankings and strategized ways by which Fox could improve its rankings.  Over time, Porat came to work most closely on rankings with two Fox employees, Isaac Gottlieb and Marjorie O'Neill.  Porat eventually eliminated the committee and consolidated responsibility for Fox's survey submissions in O'Neill, who reported directly to him.  After that, Porat continued to confer with both Gottlieb and O'Neill on rankings strategy.

At some point, Porat's efforts to raise Fox's rankings crossed the line from strategy to falsification.  Evidence at trial showed that Fox may have submitted false data to rankings publications as early as 2010.  By 2014, having reverse-

---

[1] On appeal, Porat does not challenge the truth of the evidence presented at trial, but only whether it was sufficient to convict him.  And in reviewing Porat's appeal of his conviction, "we must consider the evidence in the light most favorable to the government."  *United States v. Rowe*, 919 F.3d 752, 758 (3d Cir. 2019).  Accordingly, we state the facts as shown at trial.

engineered the methodology behind the U.S. News rankings, Porat, Gottlieb, and O'Neill used falsifications to manipulate Fox's rankings—in particular, the rankings for its Online MBA ("OMBA") and Part-Time MBA ("PMBA") programs. To better Fox's OMBA ranking, they falsely stated that 100 percent of Fox's OMBA students had taken the Graduate Management Admission Test ("GMAT"), when the actual number was much lower. They also misreported data on offers of admission, student debt, and average undergraduate grade point average. To better Fox's PMBA ranking, they combined data for Fox's PMBA program with data for its OMBA and Executive MBA ("EMBA") programs to overstate the PMBA students' average work experience and the percentage of Fox's MBA students who were PMBA students. As with the OMBA program, they also falsely reported that 100 percent of Fox's PMBA students had taken the GMAT.

Partly because of these deceptions, Fox's OMBA program rose from its U.S. News rank of Number Nine in 2014 to Number One in 2015—a position that it held for four straight years. Fox's PMBA ranking climbed steadily over three years from Number Fifty-Three in 2014 to Number Seven in 2017.

Porat viewed Fox's high rankings as a key way to market Fox to students and to thus generate more tuition money.[2] One Fox administrator testified that Porat believed

---

[2] Although the Indictment alleged that Porat sought to defraud "Fox applicants, students, *and donors*" of money, Appendix ("A") 98, 115 (emphasis added), Porat notes that most of the government's evidence at trial concerned applicants and students only. On appeal, Porat's arguments

Fox needed "good rankings and to publicize good rankings for enrollment." SA475. In a book manuscript, Porat boasted about Fox's OMBA ranking as Number One and wrote that "enhancing the school's image" is "the single most important factor in assuring continuous demand from the students, the parents, and employees." *Id.* at 299. And with Porat's knowledge and involvement, Fox aggressively marketed its false high rankings. Fox advertised its deceptively obtained rankings on its website, on social media, and on billboards and signs. Porat also sent or approved emails touting Fox's false rankings to students, student recruiters, and donors. Porat also represented to students that Fox's high rankings would bring them continuing—and even increasing—benefits. In a 2017 speech, Porat told graduating Fox students, "I often say that your diploma is like a share of stock in an enterprise … in which you remain shareholder long after you have graduated." Gov't Ex. 148. He further said that "many leading publications"—including "U.S. News"—"rank our programs among the best in the world and they agree that our stock indeed has been appreciating in value." *Id.* During a 2017 "champagne toast" held to celebrate the rankings, Porat posed for a photo with students in front of a banner that read "YOUR STOCK IS SOARING." SA733–35. Fox printed the banner and arranged the photo to use it for "PR." *Id.* at 734.

---

mainly concern his scheme to defraud applicants and students of tuition money. Because Porat's arguments on appeal focus on tuition money, and because proof that he defrauded students and applicants is enough to convict him, the discussion that follows focuses on this element of the scheme.

The advertising worked. At trial, former students testified that they chose Fox because of its rankings. One former student testified that he "decid[ed] to go with Temple University because of [its] Number 1 ranking." *Id.* at 502. He further explained that he chose Fox because he knew that "people look at [rankings]," and that "once [he] graduat[ed]," he wanted to have "been a part of" a program that "was ranked Number 1." *Id.* at 503. After learning that Fox's rankings were inflated, he regretted not choosing a school that would have given him the "same piece of paper" at a much lower cost. *Id.* at 507. Another former student testified that he believed employers hire students from schools with the best "brand" and that Fox's highly ranked brand would help him "compete in the marketplace." A172. Ultimately, Fox's Number One ranking "was the only factor in [his] decision making" in choosing Fox over another school. SA133. Enrollment numbers corroborate that Fox's falsely inflated ranking influenced students' enrollment decisions. Between the 2014–2015 and 2017–2018 academic years, enrollment in Fox's OMBA and PMBA programs spiked from 133 students to 336 students and 88 students to 194 students, respectively. The increased enrollment was tremendously lucrative. The government estimated that Fox gained nearly $40 million in tuition from the additional students who enrolled during this period (2014–2018).

As the money poured in, Porat's team discussed how to keep the rankings high and make even more money. In a January 2015 email to Porat, Gottlieb emphasized Fox's need to maintain its high rankings, cautioning that just as "being number one can potentially add over 1–200 students a year" and bring corresponding "financial value" to Fox, so could "moving down" in the rankings "result in financial losses

associated with a reduction of the 100+ students." SA749. Porat responded, "Good stuff." *Id.* In September 2015, Gottlieb copied Porat on an email about rankings for another Fox program, its Global MBA ("GMBA"). Gottlieb noted that Fox's "OMBA and PMBA doubled in intake numbers when we had a striking increase in ranking," and estimated that increasing Fox's GMBA ranking would produce "a profit of over $700,000 a year." *Id.* at 756.

Then, in early 2018, Porat's scheme was exposed. On January 9, 2018, an article discussing Fox's repeated Number One ranking highlighted Fox's self-reported 100-percent GMAT figure. That figure raised an "enormous red flag" among other Fox administrators who knew that it was false. *Id.* at 189. Nonetheless, and despite warnings from administrators that they should not proceed, Porat pushed ahead with a celebratory toast, saying "we're going." *Id.* at 336. At the toast, Porat lauded Fox's OMBA ranking. The next day, Fox administrators decided to disclose the false GMAT data to U.S. News. Yet even then, Porat continued to publicize the rankings. On January 22, 2018, he sent an email to his "Porat 100," a VIP list that included Fox donors and potential donors, with the subject line "#1 Online MBA and #2 Online BBA in the nation AGAIN!" *Id.* at 810. Two days later, on January 24, 2018, U.S. News announced that Fox's "misreported data resulted in the school's numerical rank being higher than it otherwise would have been," and that "[b]ecause of the discrepancies," it would move Fox's OMBA program to the "Unranked" category. A528–29. Fox then withdrew its other programs, including its PMBA program, from consideration in U.S. News' rankings for that year.

The exposure was a disaster for Fox's rankings. When U.S. News resumed ranking Fox, it placed both Fox's OMBA and PMBA programs in forty-first place. And as Fox's rankings fell, its enrollment did as well. Fox's OMBA enrollment plummeted from its high of 336 students in the 2017–2018 academic year to 144 in 2018–2019, and 106 the year after. Fox's PMBA enrollment dropped in each of the three years after the deception came to light, from its high of 194 students to 145, 117, and 89.

## B.     Procedural Background

On April 15, 2021, a grand jury charged Porat with one count of conspiracy to commit wire fraud in violation of 18 U.S.C. § 371, and one count of wire fraud in violation of 18 U.S.C. § 1343.

In the conspiracy count, the Indictment alleged that Porat conspired with Gottlieb and O'Neill "to devise a scheme and artifice to defraud and to obtain money and property from Fox applicants, students, and donors, by means of materially false and fraudulent pretenses, representations, and promises." A98. For the "Manner and Means" of the conspiracy, the Indictment alleged that Porat "conspired … to deceive readers of U.S. News by providing false and misleading information to U.S. News about Fox's OMBA and PMBA programs in order to fraudulently inflate Fox's ranking in the U.S. News surveys," with "goals … includ[ing] attracting more students to apply to Fox, matriculate at Fox, and pay tuition to Fox, and enticing Fox alumni and other benefactors to donate money to Fox." *Id.* at 98–99. In the wire fraud count, the Indictment alleged that Porat "devised and intended to devise a scheme to defraud Fox applicants, students, and donors out of money and

property," and incorporated the "Manner and Means" from the conspiracy count. *Id.* at 115.

Porat moved to dismiss the Indictment for failure to state an offense under Rule 12(b)(3) of the Federal Rules of Criminal Procedure. The District Court denied Porat's motion, and the case went to trial in November 2021. After a two-week trial, the jury convicted Porat on both counts.

Porat filed a post-trial motion for acquittal under Rule 29 of the Federal Rules of Criminal Procedure or, in the alternative, for a new trial under Rule 33 of the Federal Rules of Criminal Procedure. The District Court denied Porat's motion. The Court entered judgment on March 14, 2022, convicting Porat and sentencing him to fourteen months in prison and $250,200 in fines and assessments.

Porat timely appealed.

## II.    DISCUSSION

### A.    The Evidence Was Sufficient to Convict Porat

We conduct plenary review of the sufficiency of the evidence. *Rowe*, 919 F.3d at 758. In doing so, we must affirm Porat's conviction if, considering the evidence in the light most favorable to the government, there is "substantial evidence from which any rational trier of fact could find guilt beyond a reasonable doubt." *Id.* at 758–59. We conclude that there is.

We begin by briefly reciting the requirements of wire fraud as relevant to Porat's challenges on appeal. The federal wire fraud statute criminalizes "any scheme or artifice to defraud, or for obtaining money or property by means of false or fraudulent pretenses, representations, or promises." 18

U.S.C. § 1343.  The Supreme Court has consistently held that the federal fraud statutes "protec[t] property rights only." *Ciminelli v. United States*, 143 S. Ct. 1121, 1126 (2023) (alteration in original) (quoting *Cleveland v. United States*, 531 U.S. 12, 19 (2000)).[3]  Moreover, "property must play more than some bit part in a scheme: It must be an 'object of the fraud.'"  *Kelly v. United States*, 140 S. Ct. 1565, 1573 (2020) (quoting *Pasquantino*, 544 U.S. at 355).  Thus, "a property fraud conviction cannot stand when the loss to the victim is only an incidental byproduct of the scheme." *Id.*

Based on the evidence at trial, a rational jury could have found beyond a reasonable doubt that Porat engaged in the kind of scheme the wire fraud statute criminalizes: that is, that Porat trumpeted Fox's knowingly false, inflated rankings to students for the purpose of enticing his victims to pay tuition money. Moreover, a rational trier of fact could have found that the evidence established that this financial purpose was an object of Porat's scheme.  This evidence included Porat's repeated emphasis on using rankings to increase Fox's enrollment and tuition revenues, and expert testimony that rankings are crucial to many students' decisions about where to spend their tuition dollars.

The evidence also reflected that Porat intended the falsely inflated rankings to be used as an indicator of a Fox

---

[3] Congress has enacted statutes criminalizing both mail fraud and wire fraud.  *See* 18 U.S.C. §§ 1341, 1343.  We interpret "identical language in the wire and mail fraud statutes *in pari materia*." *Pasquantino v. United States*, 544 U.S. 349, 355 n.2 (2005).

degree's future value to students. As described above, Porat "often" said that a Fox degree was like a "stock" that was "appreciating in value" as Fox's rankings rose. Gov't Ex. 148. Consistent with Porat's "rising stock" assessment, the evidence at trial reflected that students viewed rankings as a way to evaluate the future yield of a Fox degree in terms of employment and earnings. Likewise, the government's expert testified that rankings are "a signal to employers that [the] program is a good program." A151.

Further, although success of the scheme is not required to sustain a wire fraud conviction, *see United States v. Frey*, 42 F.3d 795, 800 (3d Cir. 1994), evidence showed that Porat's scheme was wildly profitable for Fox. This evidence included the government's estimate that students drawn in by Porat's deception paid Fox a total of nearly $40 million. It included testimony from Fox alumni that they chose Fox for its rankings. It also included enrollment data showing that the increased rankings changed how students valued Fox's programs. In the 2014–2015 academic year, a combined total of only 221 OMBA and PMBA students were willing to pay Fox's tuition. Three years later, when Fox's rankings were at their zenith, 530 students—nearly two-and-a-half times that number—considered Fox's programs worth the price. And when Fox's rankings plummeted after the deception was exposed, Fox suffered a corresponding drop in enrollment as far fewer students decided that the Fox degree merited the tuition.

Given this substantial evidence, a rational jury could have found beyond a reasonable doubt that Porat engaged in a scheme to defraud victims of their money, and could have found that this financial object was more than an "incidental

byproduct" of the scheme. That is sufficient to convict Porat of wire fraud.

### B. The Evidence Was Sufficient to Prove Deprivation of Money

Porat argues that he did not deprive his victims of money, and makes two arguments in support. First, Porat argues that students were deprived only of rankings, and "rankings are not property." Porat Opening Br. 25. But Porat was not convicted on the theory that he deprived students of rankings; he was convicted for depriving them of *tuition money*. The Indictment charged that Porat used deception to "attract[] more students to apply to Fox, matriculate at Fox, and pay tuition to Fox." A99; *see also id.* at 115. The District Court instructed the jury that to convict Porat, it must find that he engaged in a scheme to defraud Fox "applicants, students, or donors of money," *id.* at 381, and Porat did not object to the basic contours of this instruction.[4] By convicting Porat, the jury necessarily found that he sought to defraud his victims of money. The jury's finding was reasonable, given evidence that Porat employed a scheme to "add … students" and thereby, their tuition, producing "financial value" through materially false representations of Fox's rankings. SA749. Thus, despite Porat's attempt to redirect focus to the rankings, money was an object of his scheme.

---

[4] While Porat did ask for an instruction that the jury must find he personally obtained money (an argument we address below), he did not object to the basic proposition that money satisfies the property element of fraud, nor did he ask for an instruction that a deprivation of a ranking is not a deprivation of "property."

Second, Porat argues that even if he did aim to take money from his victims, he still did not deprive them of money or property, because they received the "essential benefit of the bargain," an education. Porat Opening Br. 29. Porat further argues that the rankings, as intangible considerations, cannot legally be an essential part of the bargain because there is no "independent property interest in the U.S. News rankings." *Id.* Relying on cases from other circuits, Porat contends that there was no fraud here because the victims received a Fox education, which was the "*full* benefit of their bargain" or "*exactly* what they paid for." *Id.* at 27, 32 (emphasis added) (first quoting *United States v. Binday*, 804 F.3d 558, 599 n.46 (2d Cir. 2015), *abrogated by Ciminelli*, 143 S. Ct. at 1121; and then quoting *United States v. Takhalov*, 827 F.3d 1307, 1314 (11th Cir. 2016)). But the cases Porat relies upon do not stand for the proposition that the value of a bargain cannot include intangible considerations; rather, they suggest that a victim is only "deprived" of property when the false representation affects the very nature or value of the bargain. *See, e.g.*, *United States v. Guertin*, 67 F.4th 445, 451 (D.C. Cir. 2023) (fraud occurs when "defendant lies about the nature of the bargain itself" (quoting *Takhalov*, 827 F.3d at 1314)); *Binday*, 804 F.3d at 570 ("[W]e have upheld convictions for mail and wire fraud where the deceit affected the victim's economic calculus or the benefits and burdens of the agreement.").[5]

---

[5] Some of these cases, like *Binday*, upheld fraud convictions where no tangible property was taken, but the defendant deprived the victim of the "interest … in controlling his or her own assets." 804 F.3d at 570 (quoting *United States v. Carlo*, 507 F.3d 799, 802 (2d Cir. 2007)). However, the Supreme Court has since invalidated that theory, as "the right

Moreover, as set forth more fully above, *see supra* Section II.A, the evidence at trial reflected that the nature of the bargain between Fox and the students included not only the actual education afforded them, but also the current value of a highly ranked program, and even the future value of Fox's MBA degrees.  To be sure, it is commonly understood and fully expected that a school's ranking, and the current and future value of a particular school's degree, may fluctuate over time in the normal course, *e.g.*, with changes in a school's administration, faculty, and student body, as well as changes in the overall marketplace.  But it is not commonly understood or expected that a ranking will soar or plummet as a result of deceit or misrepresentation.  While Porat asserts that the bargain only encompassed an exchange of tuition for education, the jury was free to come to a different conclusion,[6]

to valuable economic information needed to make discretionary economic decisions is not a traditional property interest" protected by the fraud statutes.  *Ciminelli*, 143 S. Ct. at 1128.  To the extent these cases are still good law and rely on other theories of fraud not explicitly endorsed by this Circuit, we do not opine on those matters nor adopt any positions here.  Rather, we note that the broader fraud principles set forth in the cited cases do not ultimately support Porat's position.

[6] As noted above, we do not read the cases relied upon by Porat to call the jury's conclusion into question.  That is because the bargain here was simply different than the bargains at issue in the cases Porat cites.  Those cases often involved situations where the victims set the asking price and did not involve the additional consideration of the future value of the bargained-for items.  Even if those cases had involved the same

especially in light of the fact that Porat neither requested a jury instruction on this theory, nor argued it to the jury. In addition, and as set forth above, the evidence indicated that Fox's falsely inflated rankings impacted students' valuation of the bargain, impacting their assessment of a Fox education's worth and their assessment of the future yield of a Fox MBA, and causing many more students to enroll at Fox. Accordingly, we conclude that a rational jury could find beyond a reasonable doubt that the students did not receive the full benefit of their bargain, and—in the language from the cases Porat cites—that Porat's false ranking representations affected their "economic calculus," *Binday*, 804 F.3d at 570, and that he "lie[d] about the nature of the bargain itself," *Guertin*, 67 F.4th at 451.

---

type of bargain, the false representations were not of the kind that could materially affect present and future value. *See, e.g.*, *United States v. Sadler*, 750 F.3d 585, 588–90 (6th Cir. 2014) (creation of fake patients in order to buy pills from distributor at asking price); *United States v. Shellef*, 507 F.3d 82, 89–90 (2d Cir. 2007) (buyers falsely represented intent to redistribute chemicals domestically in bargain to pay distributor asking price for chemicals); *Takhalov*, 827 F.3d at 1310–11 (hostesses posing as customers in sales of alcoholic drinks to bar customers). Unlike the items bargained for in those cases, an MBA is a costly, debt-inducing, once-in-a-lifetime "purchase" expected to have long-term effects on employment and earnings. Thus, in making a cost-benefit analysis, a student-buyer would be prudent to assess the degree's effect on future earnings. While the reality may be that rankings are a poor proxy for present and future value, the jury heard evidence that both Porat and the students recognized the influence of rankings in these areas.

In sum, because the substantial evidence was sufficient for a rational jury to find that Porat knowingly used materially false representations of Fox's rank to obtain students' money in the form of tuition, the evidence satisfies the property element of wire fraud.  Accordingly, we will defer to the jury's verdict.

**C.    The Government Did Not Have to Prove the Object of Porat's Scheme Was to Personally Obtain Money**

Porat next argues that even if the government did prove that he sought to deprive his victims of money, it failed to prove a necessary corollary: that he sought to *personally obtain* money or property from his victims.  The statutory text and the case law do not compel such a reading.

The text of the wire fraud statute does not expressly provide that the defendant must seek to personally obtain property.   Rather, it broadly criminalizes "any scheme or artifice to defraud, or for obtaining money or property by means of false or fraudulent pretenses, representations, or promises."  18 U.S.C. § 1343.  The wire fraud statute makes no reference to what the defendant receives.  Porat argues that we should narrowly interpret the statutory term "obtaining" to mean bringing "into one's *own* possession." Porat Opening Br. 37 (emphasis added) (quoting *Honeycutt v. United States*, 581 U.S. 443, 450 (2017)).  But as the Second Circuit has stated, "[b]y the plain language of the statute, the identity of the ultimate beneficiary is not dispositive and the plain meaning of the word 'obtain' is sufficiently capacious to encompass schemes by defendants to obtain money for the benefit of a

favored third party." *United States v. Gatto*, 986 F.3d 104, 124 (2d Cir. 2021). We agree.

Case law also lends no support for a requirement that the defendant seek to personally obtain property. It is true that, at times, the Supreme Court has referred to the money-or-property requirement in terms of either "depriving" the victim of money or property, or "obtaining" money or property. *Compare Kelly*, 140 S. Ct. at 1571 ("The wire fraud statute thus prohibits only deceptive 'schemes to deprive [the victim of] money or property.'" (alteration in original) (quoting *McNally v. United States*, 483 U.S. 350, 356 (1987)), *with id.* at 1572 ("fraudulent schemes violate that law only when, again, they are 'for obtaining money or property'" (quoting 18 U.S.C. § 1343)). But in varying the language it used to describe the money-or-property element, the Court has never suggested that the defendant must seek to personally obtain property. In addition, in the Third Circuit, we have suggested that a defendant need not personally benefit from his fraudulent scheme to be criminally liable. *See, e.g.*, *United States v. Riley*, 621 F.3d 312, 332 (3d Cir. 2010) ("To support a fraud conviction it is 'not necessary for the Government to demonstrate that [the defendant] personally benefitted from [the] scheme.'" (alterations in original) (quoting *United States v. Goldblatt*, 813 F.2d 619, 624 (3d Cir. 1987))); *see also United States v. Al Hedaithy*, 392 F.3d 580, at 605 (3d Cir. 2004) ("[T]he mail fraud statute does not require that a scheme be designed to obtain any property from the victim; rather it is

sufficient that the scheme is designed to fraudulently deprive the victim of property or an interest in property.").[7]

Porat seeks support in the Supreme Court's statement in *Skilling v. United States*, 561 U.S. 358 (2010), that honest-services fraud lacks the "symmetry" of other kinds of "fraud in which the victim's loss of money or property supplied the defendant's gain, with one the mirror image of the other." *Id.* at 400. He argues that this passage from *Skilling* sets out a "mirror-image" rule for property fraud and means that there is no fraud unless the defendant seeks to personally obtain what the victim loses. But *Skilling* invokes the mirror-image concept only to highlight the basic structural difference between honest-services fraud and property fraud. It does not, however, prescribe a necessary condition for property fraud.

Accordingly, we reject Porat's contention that wire fraud requires proof that the defendant sought to personally obtain money or property. Because we reject this requirement, we need not address Porat's argument that the District Court

---

[7] The government argues that *United States v. Pabey*, 664 F.3d 1084, 1089 (7th Cir. 2011), and *United States v. Delano*, 55 F.3d 720, 723 (2d Cir. 1995), show that lying to benefit a third party can still be federal fraud. But it is not clear that these cases stand for that proposition, as the defendants in each case still derived at least an indirect economic benefit from their deceptions. In any event, our case law indicates that no direct personal economic benefit is required for a defendant's fraud conviction to stand. *See Riley*, 621 F.3d at 332.

erred in failing to provide his requested jury instructions on this point.[8]

### D.    The Government Did Not Have to Prove Convergence

Finally, Porat asks us to adopt a "convergence" requirement for wire fraud—that is, a requirement that the defendant deceive the same party he defrauds of money.  Porat argues that the government neither pleaded nor proved convergence here because its theory was that he deceived U.S. News, but sought to take money from students, applicants, and donors.

The Ninth Circuit is the only Court of Appeals that has required convergence.  *See United States v. Lew*, 875 F.2d 219, 221–22 (9th Cir. 1989).[9]    Other Courts of Appeal have considered and rejected it.    *See, e.g.*, *United States v. Christopher*, 142 F.3d 46, 54 (1st Cir. 1998); *United States v. Greenberg*, 835 F.3d 295, 306–07 (2d Cir. 2016); *United States v. McMillan*, 600 F.3d 434, 449–50 (5th Cir. 2010); *United States v. Seidling*, 737 F.3d 1155, 1161 (7th Cir. 2013); *United States v. Blumeyer*, 114 F.3d 758, 767–68 (8th Cir. 1997); *United States v. Kennedy*, 64 F.3d 1465, 1476 (10th Cir. 1995).

---

[8] We also need not address the government's arguments that Porat did not properly preserve his arguments on this point in the District Court.

[9] The District of Columbia Circuit has also "assume[d] without deciding" that convergence was required where "the indictment properly allege[d] convergence."  *United States v. Abou-Khatwa*, 40 F.4th 666, 675 (D.C. Cir. 2022).

In *United States v. Bryant*, 655 F.3d 232 (3d Cir. 2011), we addressed a defendant's convergence argument, and noted that "[w]e have yet to decide this issue." *Id.* at 249.  We also determined that "we need not make that decision" in *Bryant* because the evidence showed convergence in any event. *Id.* at 250.

Here, although the evidence did show that Porat sought to deceive U.S. News, it also showed that he made false statements directly to his victims.  For example, evidence showed that Porat approved emails to students and student recruiters touting the rankings, celebrated the high rankings with students, represented that the high rankings would bring students future benefits, and was involved in Fox's marketing campaigns to advertise its rankings to potential applicants. Thus, as in *Bryant*, the evidence was sufficient to convict Porat even if convergence were required.

However, we also reject Porat's argument because we hold that the wire fraud statute does not require convergence. Nothing in the text of the statute supports such a requirement. *See, e.g.*, *Christopher*, 142 F.3d at 54 ("Nothing in the mail and wire fraud statutes requires that the party deprived of money or property be the same party who is actually deceived.").  Neither do our precedents limit wire fraud in this way.  Accordingly, we join our sister circuits in rejecting the so-called convergence requirement and hold that a defendant need not deceive the same party he defrauds of money.

## III.   CONCLUSION

For the foregoing reasons, we will affirm the District Court's judgment and conviction order.

---
*United States v. Moshe Porat*
No. 22-1560
---

KRAUSE, *Circuit Judge*, concurring.

I join my learned colleague's excellent opinion in full. In this case, we did not need to expound on the line between deceit and federal wire fraud because a rational jury could easily conclude on this record that it was crossed by Porat. I write separately to reinforce that the Supreme Court and our sister circuits have identified such a line, and the Constitution requires us to police it rigorously.

Not every tort or breach of contract claim can (or should) be prosecuted as a federal crime. In the context of the myriad state-law civil claims and criminal offenses that are available to vindicate the rights of victims of deceits or mere fraudulent inducements, the Supreme Court and appellate courts have repeatedly emphasized that due process and federalism principles require the government to proceed with caution when bringing fraud prosecutions. And yet, there is a continued need for vigilance, lest prosecutors convert the fraud statutes—and the lengthy prison sentences that they can trigger—into tools to regulate good morals and business ethics.

In an effort to reduce that risk, I will review, first, the historical treatment of intangible property rights and the need to cabin what counts as criminal fraud; and, second, the recent appellate decisions engaged in this line-drawing exercise and the lessons they teach for distinguishing tortious misrepresentations from criminal fraud offenses.

## I.    The Historical Treatment of Intangible Property Rights

The problem that Porat's appeal poses is not new.  There long has been a tug-of-war over the breadth of the fraud statutes.  Originally passed in 1872, the first mail fraud law fell into prosecutors' lap at a time when Congress was articulating a broad role for the federal government in protecting all Americans, whether it be from racist violence or new, dangerous drugs.  *See* Erin C. Blondel, *The Structure of Criminal Federalism*, 98 Notre Dame L. Rev. 1037, 1068–69 (2023).  At the same time, the national economy was rapidly growing and integrating, presenting opportunities for deception on a previously unthinkable scale.  Jed S. Rakoff, *The Federal Mail Fraud Statute (Part I)*, 18 Duq. L. Rev. 771, 780 (1980).

While defrauding someone always has required "wronging one in his property rights,"[1] *Hammerschmidt v. United States*, 265 U.S. 182, 188 (1924), prosecutors, with the courts' approval, defined "property" impossibly broadly, transforming the mail fraud statute into a scheme to enforce "moral rectitude in commercial matters," Tai H. Park, *The "Right to Control" Theory of Fraud: When Deception Without Harm Becomes a Crime*, 43 Cardozo L. Rev. 135, 144 (2021).  Guilty verdicts could stand even when no one had lost tangible property; the bar to securing a conviction was low, and our circuit was no exception.  *See, e.g.*, *United States v. Clapps*,

---

[1] Even in the fraud statute's earliest form, materially misleading false advertising that went beyond mere puffery could form the basis for a conviction.  *See United States v. New S. Farm & Home Co.*, 241 U.S. 64, 71 (1916).

732 F.2d 1148, 1150 (3d Cir. 1984).   In this era, the fraud statutes became federal prosecutors' "Stradivarius, our Colt 45, our Louisville Slugger, our Cuisinart—and our true love." Rakoff, *supra*, at 771.

That era should have come to a grinding halt thirty-six years ago, when the Supreme Court held in *McNally v. United States* that the fraud statutes are "limited in scope to the protection of *property* rights" only.   483 U.S. 350, 360 (1987) (emphasis added).   And in the decades since then, the Court has made clear that the fraud statutes do not enact Article III judges' sense "of moral uprightness, of fundamental honesty, fair play and right dealing," *Skilling v. United States*, 561 U.S. 358, 418 (2010) (Scalia, J., concurring) (quoting *Blachly v. United States*, 380 F.2d 665, 671 (5th Cir. 1967)), or "standards of disclosure and good government for local and state officials," *Kelly v. United States*, 140 S. Ct. 1565, 1571 (2020) (quotation omitted).   "If Congress desires to go further," the Court has admonished, "it must speak more clearly than it has." *McNally*, 483 U.S. at 360.

Yet federal prosecutors have continued to proffer novel theories of liability that run afoul of these dictates, each time requiring the Supreme Court to step in and overturn the conviction.   In *Skilling*, to avoid due process problems, the Court limited prosecutions for the deprivation of "honest services" under 18 U.S.C. § 1346 to bribes or kickbacks.[2]   561

---

[2]   In *Skilling*, the former CEO of Enron had been charged, *inter alia*, with honest services fraud for participating in a wide-ranging conspiracy to misrepresent the company's financial health.   561 U.S. at 369.   The indictment alleged that,

U.S. at 404.  In *Kelly*, it held that "a property fraud conviction cannot stand when the loss to the victim is only an incidental byproduct of the scheme," 140 S. Ct. at 1573, regardless of whether the deprivation of cognizable property was "foreseen," *id.* at 1574.  It still must be "an 'object of the fraud.'"[3]  *Id.* at 1573 (citation omitted).

And just this spring, the Court negated the so-called "right to control" theory of property fraud, *Ciminelli v. United States*, 143 S. Ct. 1121, 1128 (2023), rejecting the Second Circuit's view that the victim's "right to control . . . his or her own assets" was cognizable property protected by the fraud statutes, *United States v. Binday*, 804 F.3d 558, 570 (2d Cir. 2015) (quoting *United States v. Carlo*, 507 F.3d 799, 802 (2d Cir. 2007)).  The Second Circuit treated the deprivation "of information necessary to make discretionary economic decisions," *id.* (quoting *United States v. Rossomando*, 144 F.3d

--------

by participating in this conspiracy, Skilling had deprived the company and its investors of his honest services—an interpretation of § 1346 that the Court agreed with Skilling would have been void for vagueness, *id.* at 412—so his conduct fell outside the statute's reach when properly construed, *id.* at 413.

[3] The defendants in *Kelly* had deprived the Port Authority of New York and New Jersey of the money it used to pay traffic engineers and toll collectors as part of their scheme to take revenge on a political opponent, but that was not enough to sustain their convictions.  That money, the Court concluded, "was incidental to—the mere cost of implementing"—the scheme.  *Id.* at 1572.

197, 201 n.5 (2d Cir. 1998)), coupled with a material misrepresentation, as sufficient to constitute federal criminal fraud, even when the victim was not any worse off economically.

The Supreme Court found that theory bereft of longstanding roots "in traditional property notions." *Ciminelli*, 143 S. Ct. at 1128. Congress may have expanded the definition of property to reach some intangible rights in some contexts (as narrowed by *Skilling*, bribes and kickbacks), but it had said nothing about "other such intangible interests." *Id.* (alteration omitted) (quoting *United States v. Sadler*, 750 F.3d 585, 591 (6th Cir. 2014)). And the infirmities the Court identified with the right to control theory went beyond precedent, text, or structure. The theory also "vastly expand[ed] federal jurisdiction without statutory authorization. Because the theory treat[ed] mere information as the protected interest, almost any deceptive act could be criminal . . . mak[ing] a federal crime of an almost limitless variety of deceptive actions traditionally left to state contract and tort law." *Id.*

As apparent from this review, three important constitutional principles undergird this jurisprudence: notice, federalism, and self-governance. First, the Fifth Amendment bars enforcement of impermissibly vague criminal laws. *See, e.g.*, *Johnson v. United States*, 576 U.S. 591, 595 (2015). This "void-for-vagueness doctrine . . . guarantees that ordinary people have 'fair notice' of the conduct a statute proscribes." *Sessions v. Dimaya*, 138 S. Ct. 1204, 1212 (2018) (quoting *Papachristou v. Jacksonville*, 405 U.S. 156, 162 (1972)); *see also United States v. Amirnazmi*, 645 F.3d 564, 588 (3d Cir. 2011) ("A statute is void on vagueness grounds if it . . . fails to provide people of ordinary intelligence a reasonable

opportunity to understand what conduct it prohibits." (internal quotation marks and citation omitted)). Otherwise, the criminal laws would unduly chill perfectly legal conduct, and law-abiding people would have to "steer far wider of the unlawful zone" than necessary to mitigate the risk of prosecution. *Baggett v. Bullitt*, 377 U.S. 360, 372 (1964) (quoting *Speiser v. Randall*, 357 U.S. 513, 526 (1958)). The constraints that the Court has imposed in *McNally*, *Skilling*, *Kelly*, and *Ciminelli* promote this due process principle.

Second, principles of federalism also inform the bounds of federal criminal law. *See Bond v. United States*, 572 U.S. 844, 859 (2014). The Supreme Court has long been concerned with the constitutional problems that arise where federal statutes "render [] 'traditionally local criminal conduct' . . . 'a matter for federal enforcement.'" *Jones v. United States*, 529 U.S. 848, 858 (2000) (quoting *United States v. Bass*, 404 U.S. 336, 350 (1971)). Thus, "[u]nless the text requires us to do so, we should not construe [criminal statutes] as a plenary ban on fraud," because doing so would "'effect a significant change in the sensitive relation between federal and state criminal jurisdiction.'" *Loughrin v. United States*, 573 U.S. 351, 362 (2014) (quoting *Bond*, 572 U.S. at 858–59); *see also Cleveland v. United States*, 531 U.S. 12, 27 (2000) ("Absent clear statement by Congress, we will not read the mail fraud statute to place under federal superintendence a vast array of conduct traditionally policed by the States."). Limitations on the fraud statutes therefore respect the distinct spheres of federal and state prosecutors.[4]

---

[4] The canon of construction articulated in *Cleveland* is consistent with recent scholarship recounting the legislative

Third, meaningful bounds on theories of fraud liability are also essential to self-governance and a republican form of government: "[I]f failure to meet the aspirational standards of moral rectitude" articulated in cases like *Blachly* "were a crime, all but the most saintly would be wholly at the mercy of federal prosecutors[.]" Park, *supra*, at 195.  Novel theories of liability like the right to control thus create "a new line of criminality" lacking "the imprimatur of democratic consensus" and reflecting only what "prosecutors and judges . . . 'personally disapprove . . . for no better reason than that [they] disapprove it.'" *Id.* at 193 (quoting *Jordan v. De George*, 341 U.S. 223, 242 (1951) (Jackson, J., dissenting)).  Cases like *Ciminelli* and *Skilling* thus also protect the constitutionality of the fraud statutes by ensuring that they cover only conduct proscribed by the people's representatives.

## II.    The Line Between Deceit and Criminal Fraud

To safeguard these principles, prosecutors must not cross, and we must police, the boundary that the Court has drawn around 18 U.S.C. § 1343: "the wire fraud statute reaches only *traditional property interests*."  *Ciminelli*, 143 S. Ct. at 1128 (emphasis added); *see also Pasquantino v. United States*,

---

history of the fraud statutes, which concludes that Congress "designed the [original mail fraud] statute primarily to protect against harms to a direct federal interest: the postal system and the post office establishment."  Norman Abrams, *Uncovering the Legislative Histories of the Early Mail Fraud Statutes: The Origin of Federal Auxiliary Crimes Jurisdiction*, 2021 Utah L. Rev. 1079, 1081.

544 U.S. 349, 356 (2005) (limiting the fraud statutes' reach to what is "ordinarily" understood as property). Nothing more. So where is that line, and how can we be sure that Porat crossed it?

On the one hand, "even if a defendant lies, and even if the victim made a purchase because of that lie, a wire-fraud case must end in an acquittal if the jury nevertheless believes that the alleged victims 'received exactly what they paid for.'" *United States v. Takhalov*, 827 F.3d 1307, 1314 (11th Cir. 2016) (quoting *United States v. Shellef*, 507 F.3d 82, 108 (2d Cir. 2007)). In other words, while "schemes that depend for their completion on a misrepresentation of an essential element of the bargain" can be federal crimes, "schemes that do no more than cause their victims to enter into transactions they would otherwise avoid" are not. *Shellef*, 507 F.3d at 108; *see also United States v. Starr*, 816 F.2d 94, 100 (2d Cir. 1987). And this limitation makes good sense. After all, if a putative victim of wire fraud got exactly what he paid for, how exactly is he a victim at all? What property did he lose?

That was the Sixth Circuit's reasoning in overturning a wire fraud conviction against a defendant who had induced a drug distributor to sell controlled substances by misrepresenting the identity of her customers (in reality, addicts and doctors) but had paid in full:

All that the evidence shows is that [the defendant] paid full price for all the drugs she purchased and did so on time. How, then, did [she] deprive the distributors of property? The government's opening bid offers this answer: [she] deprived the distributors of their pills. Well, yes, in one sense: The pills were gone after the transaction. But paying the going rate for

a product does not square with the conventional understanding of "deprive."

*Sadler*, 750 F.3d at 590.  Nor would the court uphold the defendant's conviction on the ground that her "lies convinced the distributors to sell controlled substances that they would not have sold had they known the truth."  *Id.* Instead, presaging the Supreme Court's rejection of the right to control in *Ciminelli*, the Sixth Circuit held that the "ethereal right to accurate information" does not satisfy *McNally*.  *Id.* at 591.

That was also the D.C. Circuit's reasoning upholding the dismissal of a wire fraud indictment against a foreign service officer who lied about his relationships and finances to maintain his Top Secret security clearance in *United States v. Guertin*, 67 F.4th 445 (D.C. Cir. 2023).  Drawing on *Takhalov* and *Shellef*, the court held that "[i]f an employee's untruths do not deprive the employer of the benefit of its bargain, the employer is not meaningfully defrauded[.]"  *Id.* at 451.  Absent a "difference between the honest employee and dishonest employee in terms of performance or pay," lies to one's employer "merely deprive[] the employer of honesty as such, which cannot serve as the predicate for a wire fraud conviction."[5]  *Id.* (citing *United States v. Yates*, 16 F.4th 256,

---

[5] The D.C. Circuit thus appears to have cast doubt on another innovative interpretation of § 1343: the "salary maintenance" theory of liability.  The court rejected "the Government's theory . . . that whenever an employee lies about a specific, concrete condition of employment . . . the employer is defrauded of 'money or property' by paying the employee's

267 (9th Cir. 2021)). A contrary rule, the court noted, would jeopardize due process by "giv[ing] federal prosecutors carte blanche to set the standards of disclosure and honesty in employment." *Id.* at 452; *see also Ciminelli*, 143 S. Ct. at 1128; *United States v. Abdelaziz*, 68 F.4th 1, 38 (1st Cir. 2023) (rejecting the government's understanding of what constitutes "property" under *McNally* because it would "criminalize a wide swath of conduct" such as "embellishments in a kindergarten application").

On the other hand, we recently affirmed a wire fraud conviction in *United States v. Kousisis*, 66 F.4th 406 (3d Cir. 2023), over protests that the victims had not been deprived of any property and had received the full benefit of the bargain. There, the Pennsylvania Department of Transportation (PennDOT), was administering two construction projects that had "requirements" that a certain percentage of the contracts' value be assigned to "disadvantaged business enterprises" (DBEs). *Id.* at 411. The defendants told PennDOT that they were working with a DBE, but the DBE in fact performed no work and just collected a 2.25% fee for serving as a pass-through for the real, non-DBE subcontractor. *Id.*

We identified two harms from this misrepresentation that showed PennDOT did not get what it paid for and distinguished the traditional property right at issue here from a mere right to control the disposition of one's assets based on

---

salary." *Guertin*, 67 F.4th at 451; *but see id.* at 453 (declining to adopt the Ninth Circuit's distinction between lies to obtain a new salary and lies to maintain an existing one to determine the propriety of fraud indictments).

accurate information as in cases like *Ciminelli*. First, by lying about their DBE affiliation, the defendants had "schemed to have PennDOT pay them millions of dollars that they were clearly not entitled to." *Id.* at 418. Misrepresenting one's eligibility to obtain a contract is a longstanding form of property fraud, *see id.* at 418–19; *United States v. Ruzicka*, 988 F.3d 997, 1008–09 (8th Cir. 2021), so the defendants' scheme had deprived PennDOT of cognizable property. Second, PennDOT had "pa[id] a premium" for a specific service—DBE involvement—that the defendants did not actually deliver. *Id.* at 418. It was thus irrelevant that, as they had argued on appeal, "their 'offense conduct[] involve[d] high quality, timely and fully performed work.'" *Id.* at 413. Regardless of the work's quality, PennDOT had not received the benefit of the bargain.[6]

------

[6] We also observed in a footnote in *Kousisis* that, even if PennDOT had paid no such premium, the defendants' "primary fraudulent objective to obtain [its] funds" would have sufficed to sustain a wire fraud conviction. 66 F.4th at 418 n.69. I understand this to mean that the defendants committed wire fraud whether they actually caused PennDOT to pay the premium or merely intended that it would do so as part of the fraud scheme. Either way, misrepresenting DBE status to secure a contract for which the defendants were not eligible, and to commit PennDOT to paying a premium under that contract, violated § 1343. Obviously, if this footnote were read as saying that the defendants' wire fraud convictions could stand if all they deprived PennDOT of was the right to control how their funds were disbursed, *Ciminelli* would have abrogated that conclusion just weeks later. 143 S. Ct. at 1127–28.

A few overarching lessons emerge from these cases about when deceit rises to the level of fraud, each reinforcing our holding today. First, the defendant's misrepresentations must relate to the transaction that the government alleges was fraudulent, not some earlier transaction that "opened the door" for a later, legitimate exchange. *See* Park, *supra*, at 156. For example, in *United States v. Regent Office Supply Company*, the government prosecuted a stationery company whose salespeople lied and told their prospective customers, *inter alia*, that a mutual friend had referred them, or the stationery belonged to a deceased friend of the salesperson "and that the customer would help to relieve [a] difficult situation by purchasing it." 421 F.2d 1174, 1176 (2d Cir. 1970). But those lies served only "to 'get by' secretaries on the telephone and to get 'the purchasing agent to listen to [the salesperson],'" *id.* at 1177, so they did not affect whether the defendant's counterparty got the benefit of the bargain.

This was not mail fraud. *Id.* at 1179. The salespeople had lied only to get past the door so that they could make their pitch, but, once inside, their sales pitch did not misrepresent "the quality or effectiveness of the thing being sold, or . . . the advantages of the bargain which should accrue" if their customers actually paid for the product. *Id.* at 1180. Convicting a defendant for these lies would valorize a property interest even further removed from tangible "money or property" than the right to control theory that the Court rejected in *Ciminelli. See Sadler*, 750 F.3d at 590–91. In contrast, many prospective students who had been walking past Fox's proverbial door for years only decided to stop and pay the entry fee after Fox hung out dozens of new, flashy signs advertising its (false) rankings as a proxy for the quality of its programs. *Cf. Kousisis*, 66 F.4th at 417–18.

Second, as the majority eloquently puts it, the defendant's lies must be "the kind that could materially affect present and future value." Majority Op. at 16 n.6. Thus, in *Sadler*, the court concluded the defendant's lies did nothing to affect the value of the pills in the hands of the victim-distributors. 750 F.3d at 590. The distributors set a price, and she met it. On the other hand, when deciding whether to make "a costly, debt-inducing, once-in-a-lifetime 'purchase'" of a graduate business education, Majority Op. at 16 n.6, a reasonable applicant would consider how matriculating to a given school will affect his or her earnings potential. The evidence here showed that the school's rankings in U.S. News were an important factor in that analysis. *Accord Kousisis*, 66 F.4th at 418. In this way, focusing the analysis on how the misrepresentation in question affected the transaction's value prevents courts from turning the "ethereal right to accurate information" into property that § 1343 protects. *Sadler*, 750 F.3d at 591.

Finally, the defendant must intend some economic harm from the lies. Another Second Circuit opinion is instructive here. In *United States v. Starr*, the government charged the owners of a mail delivery company with fraud for bilking the Postal Service out of over $400,000 by commingling more expensive mail in piles of lower-rate mail and sending them out in a single shipment. 816 F.2d at 96. But this was not "a deceit on their customers," so the defendants' mail fraud convictions could not stand. *Id.* at 99. As the court explained, the defendants "in no way misrepresented to their customers the nature or quality of the service they were providing," so the fact that the defendants had "misappropriat[ed] funds paid to them to cover postage fees," *id.*, while deceitful, "ha[d] no

relevance to the object of the contract,"[7] so "any 'harm' intended by the [defendants] [wa]s, at most, metaphysical and certainly not . . . sufficient to infer fraudulent intent." *Id.* at 100. Intent to cause *economic* harm is the stuff wire fraud charges are made of. And that is where Porat's case differs from the *Starr* defendants. In contrast to fraudulent inducements that deprive the victim of information immaterial to the transaction—the purview of state tort laws, *see Ciminelli*, 143 S. Ct. at 1128—Porat's lies clearly were designed to—and did—convert members of the public into Fox applicants and, ultimately, Fox students, generating some $40 million in additional tuition fees for the school over the course of the conspiracy.

\* \* \* \* \*

A rational jury could conclude on this record that Porat's lies did more than just "open the door" for a legitimate business transaction to take place; that they affected the students' understanding of the present and future value of their business degree; and that Porat intended to induce them to pay for something that was less valuable in the employment market than they were led to believe. But the Government did not prove, and we would not uphold, a wire fraud conviction predicated on lies immaterial to the ultimate matriculation decision. The line between tortious misrepresentations and

---

[7] As in *Regent*, the Starrs' lies also merely "opened the door." The fraudulent transaction was between them and the Postal Service, not between them and their customers. *Cf. United States v. Fruchter*, 104 F. Supp. 2d 289, 302 (S.D.N.Y. 2000).

federal criminal fraud thus remains bright, illuminated by the principles of notice, federalism, and self-governance.  With these understandings in mind, I join the majority's opinion in full and concur in the Judgment.